PEACE LUTHERAN CHURCH AND ACADEMY, Plaintiff-Appellant,

v.

VILLAGE OF SUSSEX and Board of Fire Appeals, Defendants-Respondents.

Court of Appeals

*No. 00–2328. Submitted on briefs March 9, 2001.—Decided May 16, 2001.*

## 2001 WI App 139

(Also reported in 631 N.W.2d 229.)

504

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *Andrew J. Zbaracki* of *Tikalsky, Raasch & Tikalsky*, Waukesha.

On behalf of the defendants-respondents, the cause was submitted on the brief of *H. Stanley Riffle* and *Julie A. Aquavia* of *Arenz, Molter, Macy & Riffle, S. C.*, Waukesha.

Before Brown, P.J., Nettesheim and Anderson, JJ.

¶ 1. ANDERSON, J. Peace Lutheran Church and Academy (Church) seeks a variance from a requirement of the Village of Sussex's Fire Prevention Code that an automatic fire sprinkler system be installed in its original building. The Church contends that such a requirement is violative of the freedom of worship and freedom of conscience because it is a burden on sincerely held religious beliefs. We conclude that the decision of the Village's Board of Fire Appeals does not burden any sincerely held religious belief since there is no evidence of the basic tenets, principles or dogmas of the Church.

¶ 2. The Church raises two other challenges to the decision of the Board. We conclude that the decision is the result of a rational decision-making process and is reasonable. Finally, we conclude that the written findings of the Board are adequate. Therefore, we affirm.

## BACKGROUND

¶ 3. The original church building was constructed in 1965. At that time, automatic fire sprinklers were not required by the Village's Fire Prevention Code. In 1993, the Village granted the Church's petition for a change of use in the building to include a preschool. Although a sprinkler system could have been required, the Village gave the Church a variance and allowed it to install smoke detectors. A second change in use was granted by the Village in 1995. When the Church wanted to start a school, the Village again did not require the installation of a sprinkler system. In 1999, a school building was constructed and attached to the original building by a breezeway. The school building has an integrated sprinkler system. As a condition of approval for the construction of the

school, the Village required the retrofitting of a sprinkler system in the original building.[1]

¶ 4. The original building is 9300 square feet and includes a church sanctuary and administrative offices. The building is set on a concrete slab. The walls are primarily cinder block with a stone facade. Exposed load bearing beams, made of wood, are used throughout the sanctuary and administrative offices and are a part of the aesthetic decor of the building. The automatic sprinkler system that is required by the Village will use two and one-half inch pipes. The pipes cannot be hidden and will go around the exposed load bearing beams because drilling through the beams will compromise their structural integrity. In the sanctuary, the pipes will have to be installed in the open areas of the ceiling and around the wall above the pulpit and into the chancel and branch lines will cross over the chancel. In addition, in the hallway and narthex of the building, the pipes will have to be installed around low beams.[2]

---

[1] The Church does not challenge the fact that the Village's Fire Prevention Code is stricter than the State of Wisconsin's provisions for the installation of automatic sprinkler systems, WIS. ADMIN. CODE ch. Comm 52, subch. II, "Automatic Fire Sprinkler Systems for Low Rise Buildings." *See Konkel v. Town of Raymond,* 101 Wis. 2d 704, 709, 305 N.W.2d 190 (Ct. App. 1981) (local ordinances may impose stricter standards than similar state regulation when the two do not conflict).

[2] In church architecture, the "narthex" is the "entrance hall leading to the nave of a church." THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (4th ed. 2000), *available at* http://www.bartleby.com/61/6/N0020600.html. The "nave" is "the central part of a church, extending from the narthex to the chancel and flanked by aisles." *Id., available at* http://www.bartleby.com/61/49/N0034900.html. The "chancel" is the "space around the altar of a church for the clergy and

¶ 5. The installation of a sprinkler system in the original building is mandated by the Village's Fire Prevention Code that is applicable to new and existing structures.[3] VILLAGE OF SUSSEX MUNICIPAL CODE § 5.15(3)(a). The relevant portions of the code require that

> every building constructed, every building structurally altered, every building remodeled, or every building whose use has changed . . . shall have an approved automatic sprinkler system installed and maintained when occupied in whole or in part as follows:
>
> (a) All Factories, Office, and Mercantile Buildings (ILHR Chapter 54 Occupancies).
> 1. Throughout Fire-Resistive buildings exceeding 7,500 square feet gross area or exceeds one level.
> 2. Throughout Non-Fire-Resistive buildings exceeding 5,000 square feet gross area or exceeds one level.

sometimes the choir, often enclosed by a lattice or railing." *Id.*, *available at* http://www.bartleby.com/61/59/C0235900.html.

[3] The sprinkler system required by the Village is defined as

an integrated system of underground and overhead piping designed in accordance with fire engineering standards. The system includes a suitable water supply such as a gravity tank, fire pump, reservoir or pressure tank and/or connection by underground piping to a municipal water main. The portion of the sprinkler system above ground is a network of specially sized or hydraulically designed piping installed in a building, structure or area, generally overhead, and to which sprinklers are connected in a systematic pattern. The system includes a controlling valve and a device for actuating an alarm when the system is in operation. The system is usually activated by heat from a fire and discharges water over the fire area.

VILLAGE OF SUSSEX MUNICIPAL CODE § 5.15(5)(e).

. . . .

(c) All Assembly Halls other than theaters (ILHR Chapter 55 Occupancies).

1. Throughout Fire-Resistive buildings exceeding 2,000 square feet gross area or exceeds one level.

2. Throughout all Non-Fire-Resistive buildings.

*Id.* at § 5.16(2).

¶ 6. The Church sought a variance from the requirement to install an automatic sprinkler system from the Village fire chief. The chief may grant a variance if it is not contrary to the public interest and "when, owing to special conditions, a literal enforcement of the Fire Prevention Code will result in practical difficulties or unnecessary hardship, provided the spirit and purpose of the Fire Prevention Code shall be observed, public safety, welfare, and justice secured." *Id.* at § 5.15(10). In lieu of an automatic sprinkler system, the Church proposed to install smoke detectors, emergency horns and alarm pull switches in the original building. The Church sought the variance because of the belief that it would be disruptive of their services.

As Lutherans, we believe that God is present with us in the Divine Service. The area of the chancel is holy ground. We bow before entering the chancel and kneel before the altar to receive the Body and Blood of Christ. Because of this, the retrofitted sprinkler system, by its very presence, will be in competition with the sacred appointments in the chancel. This can also be visually disturbing to those who are worshiping. By enforcing strict compliance of 5.16(2) of the Fire Prevention Code, the Village government is dictating how we must wor-

ship and what items we must have in our sacred space. Such an intrusion by the government, no matter the motive, is in violation of constitutional guarantees under the First Amendment with respect to freedom of worship.

¶ 7. In denying the request, the chief wrote that he believes sprinkler systems are justified because they are proven to protect the lives and safety of the Village's citizens, children and responding fire fighters. He noted a recent rash of church fires throughout the United States and expressed his opinion that sprinkler systems are the "most effective way to prevent loss of life and property in a structure fire."

¶ 8. The Church filed an appeal with the Village's Board of Fire Appeals. *Id.* at § 5.15(11). Over the course of two public hearings, the Board heard presentations from representatives of the Church and the chief. The first meeting was adjourned and the chief was directed to explore alternatives to the sprinkler system. At the second meeting, the Board heard a presentation on alternatives and further presentations from the Church and the chief. The Board voted unanimously to deny the variance. The Board's findings of facts, conclusions of law and determination will be discussed in more detail below.

¶ 9. The Church filed a petition for a writ of certiorari with the circuit court. The Church argued that requiring a sprinkler system denied its members the freedoms of worship and conscience guaranteed by the Wisconsin Constitution. The Church also argued that the Board's refusal to grant a variance was arbitrary and reflects the Board's will and not its judgment. The circuit court upheld the Board's denial of a variance, finding that the requirement for a sprinkler system did not burden sincerely held religious beliefs and that the

Board's decision was well-considered and supported by the evidence. The Church appeals.

## STANDARD OF REVIEW

¶ 10. In a certiorari action, the appellate court conducts a de novo review of the Board's and not the circuit court's decision.[4] *Schroeder v. Dane County Bd. of Adjustment*, 228 Wis. 2d 324, 330, 596 N.W.2d 472 ( Ct. App.), *review denied*, 228 Wis. 2d 176, 602 N.W.2d 761 (Wis. July 23, 1999) (No. 98–3615). Our scope of review is limited to four questions: "(1) whether [the Board] stayed within its jurisdiction; (2) whether it acted according to law; (3) whether its action was arbitrary, oppressive or unreasonable, representing its will instead of its judgment; and (4) whether the evidence was such that [the Board] might reasonably have made the determination under review." *Id.* at 330–31.

¶ 11. The first question requires us to determine whether the Board acted within the scope of its powers. The second requires this court to review the Board's procedure in light of the applicable statutes and due process requirements. *State v. Goulette*, 65 Wis. 2d 207, 215, 222 N.W.2d 622 (1974). As to the third question, it is established that a board's decision is arbitrary and represents its will if it has acted without a rational basis or the exercise of discretion. *Van Ermen v. DHSS*, 84 Wis. 2d 57, 64–65, 267 N.W.2d 17 (1978). The fourth question has been compared to the substantial evi-

---

[4] Despite our de novo standard of review, we value a trial court's decision. *Scheunemann v. City of West Bend*, 179 Wis. 2d 469, 475–76, 507 N.W.2d 163 (Ct. App. 1993). Here, the circuit court has provided us with a well-reasoned and thorough decision that is helpful and informative on the issues.

dence test under judicial review of administrative proceedings. *State ex rel. Beierle v. Civil Serv. Comm'n,* 41 Wis. 2d 213, 218, 163 N.W.2d 606 (1969). In a review of a decision on a writ of certiorari, there is a presumption that the board acted according to law and the official decision is correct; the weight and credibility of the evidence cannot be assessed. *State ex rel. Harris v. Annuity & Pension Bd.,* 87 Wis. 2d 646, 652, 275 N.W.2d 668 (1979).

## DISCUSSION

¶ 12. In this appeal, the Church contends that the Board of Fire Appeals failed to act according to a correct theory of law. Specifically, the Church criticizes the Board for making unreasonable value judgments as to the sincerity of the Church members' religious beliefs and for failing to properly apply the law to a constitutional challenge to the requirement to retrofit the church with a sprinkler system. The Church also contends that the action of the Board was arbitrary because it had no rational basis for its decision. Finally, the Church argues that the Board failed to make complete findings.

### 1. Correct Theory of Law

¶ 13. The Church contends that the Village failed to apply the correct standard for the Church's constitutional challenge to the requirement that it install a sprinkler system. The Church claims that the Village's requirements place an undue burden on the freedom of worship and the freedom of conscience. The Church faults the Village for finding that the challenge was based on aesthetic displeasure rather than sincerely held religious beliefs. The Church insists that the installation of a sprinkler system will disrupt religious

services by "desecrating the sanctuary with large pipes and sprinkler nozzles throughout." The Church maintains that it has a right to worship in a space designed around its expressions of faith and the Village does not have a right to put its value judgments on the Church's religious beliefs.

¶ 14. We will analyze the Church's argument using article I, section 18 of the Wisconsin Constitution:

> **Freedom of worship; liberty of conscience; state religion; public funds.** . . . The right of every person to worship Almighty God according to the dictates of conscience shall never be infringed; nor shall any person be compelled to attend, erect or support any place of worship, or to maintain any ministry, without consent; nor shall any control of, or interference with, the rights of conscience be permitted, or any preference be given by law to any religious establishments or modes of worship; nor shall any money be drawn from the treasury for the benefit of religious societies, or religious or theological seminaries.

We recognize that our state constitution offers more expansive protections for freedom of conscience than those offered by the Free Exercise Clause of the First Amendment to the United States Constitution. *Jackson v. Benson*, 218 Wis. 2d 835, 877 n.21, 578 N.W.2d 602 (1998); *State v. Miller*, 202 Wis. 2d 56, 64, 549 N.W.2d 235 (1996). As the Wisconsin Supreme Court has noted, the drafters of our constitution benefited from the experience of states admitted earlier to the Union and provided a comprehensive ban on discrimination against any religious group within the state. *Miller*, 202 Wis. 2d at 65.

¶ 15. We will apply the compelling state interest/least restrictive alternative test in reviewing the Church's claim. *Id.* at 66.

> [U]nder this analysis, the challenger carries the burden to prove: (1) that he or she has a sincerely held religious belief, (2) that is burdened by application of the state law at issue. Upon such proof, the burden shifts to the State to prove: (3) that the law is based on a compelling state interest, (4) which cannot be served by a less restrictive alternative.

*Id.* This test is applied strictly, regardless of whether the burden created by law is incidental or significant. *Kollasch v. Adamany*, 99 Wis. 2d 533, 550, 299 N.W.2d 891 (Ct. App. 1980), *rev'd on other grounds*, 104 Wis. 2d 552, 313 N.W.2d 47 (1981).[5] It is not enough for the

---

[5] The Church argues that our decision in *Kollasch v. Adamany*, 99 Wis. 2d 533, 299 N.W.2d 891 (Ct. App. 1980), is a nullity since it was reversed by the Wisconsin Supreme Court in *Kollasch v. Adamany*, 104 Wis. 2d 552, 313 N.W.2d 47 (1981). The issue in *Kollasch* was whether the Sisters of St. Benedict were subject to state sales tax for that portion of charges they made to guests for food and lodging. *Id.* at 554. We found that the applicable statutes required the sisters to obtain a sales tax permit and pay tax on nonexempt sales, *Kollasch*, 99 Wis. 2d at 547, and that the sales tax was not a burden to their exercise of religion; hence, the statutes were constitutional. *Id.* at 558. The supreme court reversed our decision. The supreme court held that the applicable sales tax statute did not apply to the sisters and, in the exercise of judicial prudence, did not address the constitutionality of the statute. *Kollasch*, 104 Wis. 2d at 554.

The Church is wide of the mark in its argument that we cannot rely upon our decision in *Kollasch*. Ordinarily, holdings not specifically reversed on appeal retain precedential value. *Spencer v. County of Brown*, 215 Wis. 2d 641, 650, 573 N.W.2d

Church to show that the application of the Village's Fire Prevention Code burdens it in some way; the burden must be related to the exercise of a religious belief. *Id.*

¶ 16. The first prong of the analysis requires us to determine whether the Church has a sincerely held religious belief. In *Miller*, the State conceded that the respondents were members of the Old Order Amish and "live 'separate and apart from the world' in a community in which religion permeates every aspect of their lives." *Miller*, 202 Wis. 2d at 69. There is no such concession from the Village that the Church holds sincere religious beliefs about what may be inside of their area of worship. In testimony and a written submission, the Church deacon stated that the membership believes that God is present during church services and the chancel is holy ground. While expressing the opinion that the sprinkler system would be in competition with the sacred appointments inside the church, the deacon presented no evidence that basic tenets, principles or dogmas of the Church prohibit the presence of secular items in the worship space.

¶ 17. In *State v. Yoder*, 49 Wis. 2d 430, 182 N.W.2d 539 (1971), a case challenging the applicability of Wisconsin's compulsory education law to the Amish, expert testimony was presented on the religious beliefs and tenets of the Old Order Amish. *Id.* at 435–36. In *Kollasch*, the court had evidence that included the ori-

222 (Ct. App. 1997). Here, we cite to our decision in *Kollasch* because of the strength of its legal reasoning on the question of whether the Village's requirements violate the Church's freedom of worship and freedom of conscience. We are not the first to rely upon the legal reasoning expressed in *Kollasch*; it was cited for the same reason by the Wisconsin Supreme Court in *State v. Miller*, 202 Wis. 2d 56, 69, 549 N.W.2d 235 (1996).

gins of the order, the original rule for those who wished to join the order and the specific rules governing how members of the order were to treat guests. *Kollasch*, 99 Wis. 2d at 538–40, nn.2–4. In the present case, there are only broad statements from the deacon of the Church, but no evidence of which of the Church's basic tenets, principles or dogmas support the statements.

¶ 18. In addition to the pastor and deacon, two members of the Church were present at the first meeting of the Board of Fire Appeals. Lee Weber stated that the sprinkler system "is aesthetically not what he is accustomed to." He asked the Board to look at the Church's point of view for its worship area. Wayne Loos declared that the sprinkler system would be an intrusion on the worship services and an eyesore and would interrupt his personal worship. Both of the members stated that the congregation did not want the sprinkler system "if not absolutely necessary," but did acknowledge that the sprinkler system was not impractical.

¶ 19. The presentations by the representatives of the Church do not provide enlightenment on the question of whether there are sincerely held beliefs that proscribe secular items within the church sanctuary. Without evidence of the Church's basic tenets, principles or dogmas, it is impossible to establish how the application of the Village's Fire Prevention Code would create a substantial burden on worship in the church. At best, the installation of a sprinkler system would prove distracting and aesthetically displeasing to the members of the Church.

¶ 20. Without evidence that the Church has sincerely held religious beliefs about secular items, such as the sprinkler system, being visible in its worship space, we are unable to determine whether those

beliefs are burdened by the application of the fire code. Under other circumstances, we have pointed out that the application of civil law requirements to religious beliefs does not always result in a burden on those beliefs.

> Free exercise of religion does not necessarily mean the right freely to act in conformity with a religion. "The free exercise of religion means, first and foremost, the right to believe and profess whatever religious doctrine one desires." The United States Supreme Court has "never held that an individual's religious beliefs excuse him from compliance with an otherwise valid law prohibiting conduct that the State is free to regulate." Nor has the United States Supreme Court ever held "that when otherwise prohibitable conduct is accompanied by religious convictions, not only the convictions but the conduct itself must be free from governmental regulation."

*Lange v. Lange*, 175 Wis. 2d 373, 383–84, 502 N.W.2d 143 (Ct. App. 1993) (citations omitted).

¶ 21. Because the Church has failed to prove that there is a sincerely held religious belief that is substantially burdened by the application of the Village's Fire Prevention Code, our analysis could stop here. However, we believe that judicial completeness requires us to briefly address the last two prongs of the compelling state interest/least restrictive alternative test: that the law is based upon a compelling state interest which cannot be served by a less restrictive alternative.

¶ 22. The requirement that a sprinkler system be installed in the original building is based on a compelling Village interest: the saving of lives and

preservation of property.[6] The fire chief testified before the Board that a sprinkler system has a proven track record in saving lives and property. Because the Village has a volunteer fire department, with no on-duty fire fighters, a sprinkler system provides an immediate response to a fire and benefits the volunteer fire fighters and the Church by preventing the rapid spread of a fire. The evidence presented to the Board proved that there were no alternative fire suppression systems that could be installed instead of the sprinkler system. Additionally, the alternatives proposed by the Church—smoke detectors, emergency horns and alarm pull boxes—do not operate as a fire suppression system benefiting the occupants of the building and the volunteer fire fighters. Therefore, any burden the Fire Prevention Code may have on the sincerely held beliefs of the Church is outweighed by the compelling interest in preserving life and property, and this compelling interest cannot be met by any less restrictive alternative.

## 2. *Arbitrary Action*

¶ 23. The Church argues that there is no rational basis for the Board's decision. It complains that the Board failed to give serious consideration to the building components of the structure or the benefits of the alternatives it suggested. The Church also contends that the Board had no guidelines under which it could

---

[6] The general purpose of the Village's Fire Prevention Code is the "safeguarding, to a reasonable degree, life and property from the hazards of fire and explosion arising from storage, handling and use of hazardous substances, materials and devices and from conditions hazardous to life or property in the use or occupancy of buildings or premises within the Village." VILLAGE OF SUSSEX MUNICIPAL CODE § 5.15(1).

determine when a variance to the fire code would be appropriate.

¶ 24. We have previously explained that

[a]n arbitrary action or decision is "one that is either so unreasonable as to be without a rational basis, or one that is the result of an unconsidered, willful or irrational choice of conduct—a decision that has abandoned the 'sifting and winnowing' process so essential to reasoned and reasonable decisionmaking." Generally, we have equated the term "unreasonable" with irrational or lacking "a rational basis."

*Glacier State Distrib. Serv., Inc. v. DOT*, 221 Wis. 2d 359, 369–70, 585 N.W.2d 652 (Ct. App. 1998) (citations omitted). We determine whether the Board's action had a rational basis, not whether the Board acted on the basis of factual findings. Rational choices can be made in a process that considers opinions and predictions based on experience. *Sterlingworth Condo. Ass'n v. DNR*, 205 Wis. 2d 710, 730, 556 N.W.2d 791 (Ct. App. 1996).

██

¶ 25. When considering a variance request, the Board is to make a discretionary call on a case-by-case basis as to whether, and if so by how much, the Fire Prevention Code is to be relaxed. *See Miswald v. Waukesha County Bd. of Adjustment*, 202 Wis. 2d 401, 412, 550 N.W.2d 434 (Ct. App. 1996). The Board is guided in its reasoning process by the Fire Prevention Code and the requirement that a variance can only be granted if it is not contrary to the public interest, and "when, owing to special conditions, a literal enforcement of the Fire Prevention Code will result in practical difficulties or unnecessary hardship, provided the spirit and pur-

pose of the Fire Prevention Code shall be observed, public safety, welfare, and justice secured." VILLAGE OF SUSSEX MUNICIPAL CODE § 5.15(10).

¶ 26. Our review of the record made before the Board convinces us that the refusal to grant a variance was not arbitrary, oppressive or unreasonable. The Board considered the Church's request over two meetings. The Church's pastor and deacon made a presentation on why a variance from the requirement to install a sprinkler system should be granted. The Board members and the Church's representatives engaged in a wide-ranging exchange in which the proposed sprinkler system and its interplay with the interior architecture of the Church were discussed. The two prior changes to the old building were discussed, as well as the reason why the Church was given variances from the requirement to install a sprinkler system when the changes were approved.

¶ 27. The fire chief made a presentation in support of his decision not to grant a variance. He told the Board that he believed that aesthetics was the reason that the Church was seeking a variance. He explained to the Board that another church in the Village retrofitted its worship space with a sprinkler system without seeking a variance. The chief told the Board that the Church's proposed alternatives were fire detection and warning systems and were not equivalent to a fire suppression system. He pointed out that there were alternative fire suppression systems—mist, haylon or carbon dioxide—that the Church could explore, as well as less obtrusive sprinkler systems. The chief stated that the sprinkler system has a proven track record; that it is required in the Church because of all the interior wood; and that because the fire department

520

depends upon volunteers, it would benefit the fire fighters.

¶ 28. The fire chief was questioned about the variances granted to the Church in the past. He responded that he was not the fire chief when those variances were granted. When asked whether he would have granted the variances, the chief said he would not have. The chief's primary concern was that the original building would be used for classes and he considered it an educational facility. Before the meeting was adjourned, the Board directed the fire chief to meet with the Church to explore viable alternatives.

¶ 29. At the reconvened meeting, the Board reviewed alternatives outlined in a report prepared by a member of the fire department. After final presentations by the Church's deacon, the Board debated the request in an open session. One member of the Board expressed the opinion that if a variance was granted for aesthetics, no churches in the Village would have to be equipped with sprinkler systems because there would be pipes in the sacristy. Another member concluded that it would not be impractical for the Church to install a sprinkler system. While expressing general reservations about denying the variance, the final member of the Board joined the other two members in voting against the Church's request.

¶ 30. The Board reduced its decision to written findings of fact, conclusions of law and determination that closely mirrors its debate and accurately reflects the record of the two meetings. The Board set forth the reasons of the Church for requesting the variance. The Board relied upon the fire chief's belief that "sprinkler systems have a demonstrated ability to save property and to save lives, and also to protect the lives and well-

being of firefighters who respond to fires." The Board found that there were no structural impediments inside of the church; therefore, it was not impossible to install the sprinkler system. The Board found that while the sprinkler system would be visible, it was not impractical to install. Finally, the Board found that to grant the variance would be contrary to the public interest as well as the spirit and purpose of the Fire Prevention Code. As our discussion demonstrates, the Board's decision is reasonable and has a rational basis.

### 3. Sufficiency of Board's Findings

¶ 31. The Church maintains that the Board failed to make written findings on the constitutional issues it raised in requesting the variance. The Church argues that *Edmonds v. Board of Fire & Police Commissioners*, 66 Wis. 2d 337, 224 N.W.2d 575 (1975), requires specific findings addressing each issue of law presented. It contends that the failure of the Board to address the constitutional issues leaves this court with insufficient information to decide if the Board acted in a reasonable manner.

¶ 32. *Edmonds* does stand for the proposition that "as a matter of due process and sound administrative procedures . . . an administrative agency is required to make definite and certain findings of fact, together with its conclusions of law." *Harris*, 87 Wis. 2d at 660. In *Harris*, the Wisconsin Supreme Court qualified the obligation *Edmonds* imposes upon agencies and Boards to memorialize their determinations.

> There is no requirement that the administrative agency indulge in the elaborate opinion procedure of an appellate court. It is sufficient if the findings of fact and conclusions of law are specific enough to

inform the parties and the courts on appeal of the basis of the decision.

*Harris*, 87 Wis. 2d at 661.

¶ 33. The Board is not required to make findings that respond to every issue the Church raised in its request for a variance. In the present case, the findings of fact, conclusions of law and determination rendered by the Board of Fire Appeals were specific enough to inform the parties, as well as this court on appeal, of the basis of the decision.

## CONCLUSION

¶ 34. We affirm the decision of the Board of Fire Appeals denying the Church a variance from the dictates of the Fire Prevention Code for several reasons. First, to succeed in the constitutional challenge to the Fire Prevention Code, the Church had the initial burden of proving that there was a sincerely held religious belief that would be burdened by the application of the code. The Church failed to carry this burden because it did not present evidence of any basic tenet, principle or dogma supporting representations that an exposed sprinkler system would desecrate the worship space. Second, the Board's determination is the result of a reasonable and rational decision-making process. Finally, the Board's written findings of fact, conclusions of law and determination are sufficient and do not have to address every issue raised during the hearings.

*By the Court.*—Order affirmed.